**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**FRANKFORT DIVISION**

**Filed Electronically**

| | | |
|---|---|---|
| LARRY VERNON SANDERS | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | CASE NO. 3:16-cv-00014-GFVT |
| | ) | |
| BEMIS PACKAGING, LLC | ) | |
| | ) | |
| DEFENDANT | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF BEMIS' MOTION FOR SUMMARY JUDGMENT**

Sanders, who is currently employed by Bemis as a Material Handler, claims that he was discriminated against because of his asserted disability (diabetes) when, for a six-month period, Bemis required him to work the same 12-hour shift that all other Material Handlers do, after Sanders' doctor opined that Sanders is able to perform the essential functions of his job, is not substantially limited in any major life activity, and has no functional limitations. Sanders also claims that he was discriminated against because of his gender, even though the female employee he alleges was treated more favorably holds a completely different job from Sanders and is not similarly situated to him. While Sanders claims that he was retaliated against for leaving work early without permission to do so, he admits that he never experienced any discipline or other adverse employment action as a result. Similarly, while Sanders asserts claims for promissory estoppel and intentional infliction of emotional distress, he fails to present evidence to support either claim. Accordingly, Sanders' claims should be dismissed in their entirety, with prejudice, and Bemis' Motion for Summary Judgment should be granted.

## STATEMENT OF UNDISPUTED FACTS

The facts in this case are *not* in dispute. For the limited purposes of this Motion, Bemis has outlined the facts in the light most favorable to Sanders.

**1. Sanders works at a facility that Bemis acquired in 2009.**

Sanders is currently employed by Defendant Bemis Company, Inc. (incorrectly named as Bemis Packaging, LLC), a flexible packaging company with a plant in Shelbyville, Kentucky.[1] The plant operates seven days a week, 24 hours a day, receiving raw materials that are manufactured into packaging products and then shipped to customers.[2] Sanders has worked at the same facility since 1992 for several predecessor companies that have owned and operated that facility.[3] Throughout Sanders' employment at the facility, the business has operated on 12-hour shifts: a day shift and a night shift.[4]

In 2002, the facility was owned and operated by Alcan; Sanders, who was working 12-hour shifts in the plant at the time, asked Alcan's Human Resources Manager to allow him to work eight-hour shifts.[5] Eventually, Alcan agreed to this request.[6]

In 2009, Bemis acquired the facility and offered Sanders a position, which Sanders accepted on September 13, 2009.[7] Bemis did not alter Sanders' eight-hour shift schedule.[8] Sanders admits that he is an at-will employee and that he was never promised or told that he would work only certain hours, certain days of the week, or a certain schedule.[9]

After accepting Bemis' offer, Sanders completed a post-employment questionnaire on which he was asked to indicate whether he had any disability and whether he "required any reasonable

[1] Bemis Answer, paragraph 7; Larry Sanders Deposition, p. 131, Exhibit. 1.
[2] Larry Sanders Deposition, pp. 133-134, Exhibit 2.
[3] Larry Sanders Deposition, pp. 24-25, Exhibit 3.
[4] Larry Sanders Deposition, p. 135, Exhibit 4.
[5] Larry Sanders Deposition, pp. 182-185, Exhibit 5.
[6] Larry Sanders Deposition, pp. 184, 187, Exhibit 6.
[7] September 3, 2009 Letter from Bemis to Sanders, Exhibit 7.
[8] Larry Sanders Deposition, pp. 194, 208, Exhibit 8.
[9] Larry Sanders Deposition, pp. 197; 393-395, Exhibit 9.

accommodations we can make which would enable you to perform the job properly and safely, including special equipment or other accommodations."[10] Neither Sanders nor his wife (who completed the form for him) indicated to Bemis that he has a disability or a need for any accommodation.[11]

The Bemis facility is comprised of two buildings: a manufacturing plant and a warehouse. At the time Bemis hired Sanders, he worked in the plant. As a 24/7 facility, the operation is staffed with 12-hour shifts that alternate work schedules, with three days (36 hours) worked one week and four days (48 hours) worked the following week.[12] This schedule allows the facility to run seven days per week, including Saturdays and Sundays.[13] Sanders admits that Bemis and predecessor owners maintain this work schedule strictly for business needs, not to single him out.[14]

The warehouse building typically operates with three Material Handlers on a given shift: two Material Handlers doing receiving and one doing shipping.[15] If one employee is absent, it creates a sizable amount of work for the other two material handlers to cover and generates backlog that must be handled by other workers.[16]

Based on his preference not to work in the manufacturing plant, Sanders moved to the warehouse in 2013 as a material handler on the receiving side of the warehouse.[17] Sanders' job duties include receiving raw materials that are received in the warehouse, applying a barcode to the materials and entering information into the computer system to track materials, and moving materials from the warehouse to the plant using a seated forklift.[18] Sanders sits when entering data into the computer and when moving freight with the forklift. He walks and stands when scanning

---

[10] Larry Sanders Post-Employment Questionnaire, attached as Exhibit 10.
[11] Larry Sanders Deposition, p. 193-194, Exhibit 11.
[12] Larry Sanders Deposition, pp. 224, Exhibit 12.
[13] Larry Sanders Deposition, p. 391, 394, Exhibit 13.
[14] Larry Sanders Deposition, p. 135, 394, Exhibit 14.
[15] Larry Sanders Deposition, pp. 137-138, Exhibit 15.
[16] Larry Sanders Deposition, p. 139, Exhibit 16.
[17] Larry Sanders Deposition, p. 323, Exhibit 17.
[18] Larry Sanders Deposition, pp. 131-133, Exhibit 18.

bar-codes on delivered raw materials.[19] When Sanders moved to the warehouse, he continued to work Monday through Friday, 7:00 AM to 3:00 PM. [20] Bemis had essentially inherited this work schedule when it acquired the company and Sanders remained the only Bemis Material Handler who worked this schedule, both with respect to the days worked and the number of hours.[21]

**2. Sanders begins working 12-hour shifts.**

In June 2014, demand in the warehouse increased and Sanders' manager Mike Purvis told Sanders that Bemis needed him to work the same 12-hour schedule that the other Material Handlers worked.[22] Sanders spoke to Bemis' then-Human Resources Manager Dotty Newkirk to seek an exemption from the regular 12-hour shift schedule "because of his diabetes."[23] Because Sanders could not explain how or why his diabetes precluded him from working a 12-hour shift, Newkirk provided Sanders a letter outlining information Bemis needed from his doctor to understand the nature of his medical restrictions.[24] Sanders admits that neither Purvis nor Newkirk ever said anything negative or derogatory to him about his requested work shift or his diabetes, at this time or any other.[25]

Newkirk's cover letter to Sanders' medical provider, Dr. Wood, expressly asks that the physician "provide additional information about accommodations that Bemis Company can provide to permit [Sanders] to perform the essential functions of [his] position, Material Handler."[26]

Sanders told his doctor that he did not *want* to work a 12-hour shift, but he admits that he did not discuss with Dr. Wood whether he was *able* to work 12-hour shifts with additional breaks, by

---

[19] Larry Sanders Deposition, p. 239. Exhibit 19.
[20] Larry Sanders Deposition, pp. 194; 208, previously attached as Exhibit 8.
[21] Larry Sanders Deposition, p. 383-385, Exhibit 20.
[22] Larry Sanders Deposition, pp. 208-209, Exhibit 21.
[23] Larry Sanders Deposition, p. 210, Exhibit 22.
[24] Larry Sanders Deposition, p. 210, previously attached as Exhibit 22.
[25] Larry Sanders Deposition, p. 211, 213, Exhibit 23.
[26] June 4, 2014 Letter from Bemis to Dr. Donald Wood, attached as Exhibit 24.

performing some work in an office setting, or with some other accommodation.[27] He does not recall Dr. Wood ever saying that he was physically incapable of working a 12-hour shift.[28] Dr. Wood completed the form and specifically stated that:

- Sanders is not "substantially limited in any major life activities as a result of" his diabetes;
- Sanders' diabetes did not cause him "any functional limitations like the ability to reach, stand, bend, grip, concentrate, speak, etc.";
- Sanders is able to perform the essential functions of his job and has no limitations.[29]

Dr. Wood further stated that he "recommends" that Sanders "have a job that has minimal levels of stress" and that "he work an eight-hour shift rather than a 12-hour shift and that the shift be the same time [e]very day."[30] There is no evidence that an eight-hour shift is medically necessary to conform to any limitation and, indeed, according to his doctor, Sanders has no limitations at all.

After presenting this letter to Bemis, Sanders met with Newkirk to discuss his work schedule.[31] Given Dr. Wood's opinion that Sanders has no limitations, is able to perform the essential functions of his job, and is not substantially limited in any major life activity, Newkirk told Sanders that he would be required to work the regular Material Handlers shift schedule, effective June 30, 2014.[32] Sanders was expressly told that the required schedule was based on the medical information provided by his doctor.[33] Newkirk informed Sanders that he could take additional breaks if needed throughout his shift and that Bemis would be flexible with him about his needs.[34] Sanders described the meeting as "straightforward" and indicated that he had no questions.[35]

[27] Larry Sanders Deposition, pp. 217-218, Exhibit 25.
[28] Larry Sanders Deposition, p. 217, previously attached as Exhibit 25.
[29] June 20, 2014 Documentation from Dr. Wood, Exhibit 26.
[30] June 20, 2014 Documentation from Dr. Wood, previously attached as Exhibit 26.
[31] Larry Sanders Deposition, p. 225, Exhibit 27.
[32] Larry Sanders Deposition, p. 226, Exhibit 28.
[33] Larry Sanders Deposition, p. 227, Exhibit 29.
[34] Larry Sanders Deposition, p. 227-228; June 27, 2017 Notes from Dotty Newkirk, collectively attached as Exhibit 30.
[35] Larry Sanders Deposition, pp. 226-228, Exhibit 31.

Sanders admits that he did not say in that meeting, *or at any other time,* that he thought he was being treated unfairly or discriminated against for any reason.[36]

On June 30, 2014, Sanders began working 12-hour shifts on the regular Material Handler work schedule and had no problem doing so.[37] And, for the next six months, Sanders continued working the standard 12-hour shift schedule of three days on/four days on and performed all duties of his job.[38] He did not request, *nor did he need,* additional breaks at any time while working 12-hour shifts.[39] Further, while working 12-hour shifts, Sanders testified that he was a good worker, pulled his own weight as an employee, and was able to perform – and did perform – all aspects of his job: loading, unloading, moving and staging materials, record-keeping and so on.[40] Throughout the six months, Sanders never asked for any job modifications or allowances and was never denied any by Bemis.[41]

**3. Sanders unilaterally begins working eight-hour shifts.**

On December 24, 2014, Sanders went to see a new doctor, Dr. Arar, and obtained a note from this doctor stating, "No prolonged standing . . . Not to work more than an eight-hour day."[42] Sanders admits that he did not tell Dr. Arar that he had in fact been working a 12-hour shift for six months without problem and without any modifications.[43] He further admits that he never told Dr. Arar that he had been performing each and every aspect of his job throughout the 12-hour shifts for the past six months.[44] Sanders did not discuss with Dr. Arar his job duties or the physical requirements of the job.[45] Nor did he disclose to Dr. Arar that the Material Handler position

---

[36] Larry Sanders Deposition, pp. 404-405, Exhibit 32.
[37] Larry Sanders Deposition, pp. 228-229, Exhibit 33.
[38] Larry Sanders Deposition, pp. 229-230, Exhibit 34.
[39] Larry Sanders Deposition, pp. 227-230, Exhibit 35.
[40] Larry Sanders Deposition, pp. 229-230, Exhibit 36.
[41] Larry Sanders Deposition, pp. 245-246, Exhibit 37.
[42] Larry Sanders Deposition, pp. 232; December 24, 2014 note from Dr. Arar, collectively attached as Exhibit 38.
[43] Larry Sanders Deposition, pp. 232-233, Exhibit 39.
[44] Larry Sanders Deposition, pp. 232-233, previously attached as Exhibit 39.
[45] Larry Sanders Deposition, p. 244, Exhibit 40.

involves seated work throughout the workday when performing documentation, record review, operating the forklift, and checking purchase orders and entering information on the computer.[46] Sanders further admits that he never talked to Dr. Arar about possible modifications while working the 12-hour shift, such as additional breaks, extra meal periods, more frequent sitting, or the like.[47] Indeed, Sanders concedes that he did not need any modifications in order to work the 12-hour shift.[48] Since obtaining this note from Dr. Arar, Sanders has not had any further contact, appointment, treatment, or consultation with Dr. Arar.[49]

After Sanders received this note from Dr. Arar, he unilaterally decided to start leaving his shift four hours early. Instead of working his 7:00 AM to 7:00 PM shift with the other two Material Handlers, Sanders left work at 3:00 PM every workday.[50] Sanders admits that no one at Bemis authorized him to leave work early.[51] In order to make up the four hours of work he skipped on his scheduled work days, Sanders began showing up on days that he was not scheduled to work. Sanders admits that no one at Bemis ever asked or instructed Sanders to report for work on his off days and he further admits that he was not needed to perform work with the regularly scheduled Material Handlers on his off days.[52] Despite the fact that he was not authorized to leave his shift early every workday, Sanders never received any discipline nor any occurrence points under Bemis' attendance policy.[53] According to Sanders, he unilaterally set his own work schedule because he thought his doctor "wanted" him to do so.[54] Ultimately Sanders was told not to report for work on

---

[46] Larry Sanders Deposition, p. 235-236, 244, collectively Exhibit 41.
[47] Larry Sanders Deposition, p. 245-246, Exhibit 42.
[48] Larry Sanders Deposition, p 227-229, 232-233, collectively Exhibit 43.
[49] Larry Sanders Deposition, p. 245, Exhibit 44.
[50] Larry Sanders Deposition, p. 114, Exhibit 45.
[51] Larry Sanders Deposition, p. 114, previously attached as Exhibit 45.
[52] Larry Sanders Deposition, p. 115-116, Exhibit 46.
[53] Larry Sanders Deposition, p. 201, Exhibit 47.
[54] Larry Sanders Deposition, p. 114, previously attached as Exhibit 45.

his off days unless needed by the company.[55] While he was told that he could sign up for voluntary overtime when it was available, he has only signed up for overtime once.[56]

In January 2015, Bemis' current Human Resources Manager, Kristina Mellen, sent a letter to Dr. Arar asking if Sanders was able to perform the essential functions of the Material Handler position, as he had been doing for the past six months, including a 12-hour shift, with or without any sort of accommodation.[57] Again, Sanders admits that he did not talk with Dr. Arar about the medical necessity of an eight-hour shift or whether he could continue to perform the essential functions of the job on the 12-hour shift, with or without any changes such as extra breaks when needed, extra meal breaks, ability to sit when needed, or other measures.[58] Indeed, Dr. Arar did not examine Sanders and Sanders has not been seen by Dr. Arar since his one and only appointment in December 2014.[59] Further, he admits that he never talked with Dr. Arar about the fact that he had, in fact, been working a 12-hour shift for the six months prior to this letter.[60]

On February 6, 2015, Dr. Arar responded by simply saying that "[t]his office has requested that Mr. Sanders only work eight-hours per day due to his neuropathy which is secondary to diabetes."[61] Dr. Arar did not answer Bemis' questions regarding possible modifications to allow Sanders to continue to work the 12-hour shift as he had done for six months. Thus, Bemis again corresponded with Dr. Arar requesting this information.[62]

Dr. Arar's office prepared a draft response that was then faxed to Sanders' wife to solicit her input on the response.[63] Sanders' wife has no medical training and has no personal knowledge about

---

55 Larry Sanders Deposition, p. 115, previously attached as Exhibit 46.
56 Larry Sanders Deposition, pp. 121-123, Exhibit 48.
57 Undated Letter to Ghias Arar, attached as Exhibit 49.
58 Larry Sanders Deposition, p. 245-246, previously attached as Exhibit 42.
59 Larry Sanders Deposition, p. 245, previously attached as Exhibit 42.
60 Larry Sanders Deposition, p. 248, Exhibit 50.
61 February 6, 2015 Letter from Dr. Arar, attached as Exhibit 51.
62 Letter to Ghias Arar, attached as Exhibit 52.
63 March 11, 2015 Fax Correspondence to Julie Sanders, attached as Exhibit 53.

Sanders' job or Bemis' operations.[64] Evidently, Ms. Sanders approved the draft and Dr. Arar responded to Bemis that Sanders is not in fact limited to an eight-hour shift: "[o]nly Mr. Sanders can determine if he is getting enough rest and feels up to performing his duties for 12-hours instead of eight-hours . . . He could occasionally feel up to working the 12-hour shift, but again, that determination would be based on how he feels."[65] But, Sanders testified that he did not want to work over eight hours per day, whether it is 9, 10, 11 or 12 hours.[66] And, despite Dr. Arar's opinion that he could work a 12-hour shift, Sanders did not ever discuss with anyone at Bemis – or even consider – working a 12-hour shift one or more days per workweek.[67]

**4. Bemis provides Sanders with a scheduled eight-hour shift.**

Even though Dr. Arar's March 11, 2015 letter indicated that Sanders could work a 12-hour shift based on how he felt, and even though Sanders had worked the regular 12-hour shift schedule for six months without a single problem, Bemis made efforts to determine if it could provide Sanders with an eight-hour shift as a Material Handler. At this point, communications concerning this issue were handled primarily through counsel for the parties.[68] Ultimately, Bemis agreed to allow an eight-hour shift for Sanders on the same schedule as the other Material Handlers (three days one week, four days the next week) and working from 11:00 AM to 7:00 PM, when a third Material Handler is most needed.[69] Bemis presented this schedule to Sanders on a trial basis in July 2015; Sanders has worked this schedule consistently since then. Bemis also allowed Sanders to gradually transition into his new schedule.[70] Over the next month, while counsel for Sanders and Bemis engaged in discussions concerning this proposed schedule, Sanders insisted on working his preferred Monday to Friday schedule without weekend work and leaving work by 3 p.m., despite the fact that

[64] Larry Sanders Deposition, pp. 276-277, Exhibit 54.
[65] March 11, 2015 Letter from Dr. Arar, attached as Exhibit 55.
[66] Larry Sanders Deposition, pp. 391-392, Exhibit 56.
[67] Larry Sanders Deposition, pp. 257-258, Exhibit 57.
[68] Larry Sanders Deposition, p. 262, Exhibit 58.
[69] Larry Sanders Deposition, pp. 265-267, Exhibit 59.
[70] Larry Sanders Deposition, pp. 265-267, previously attached as Exhibit 59.

no physician has ever said Sanders is unable to work on weekends or afternoons.[71] Ultimately Bemis requested that Sanders begin transitioning to his new 8-hour schedule working 11:00 AM to 7:00 PM on the same days/schedule as other Material Handlers.[72]

Since July 2015, Sanders has been working eight hours a day, starting and leaving at the same time for each day that he works.[73] Sanders continues to perform all functions of his job and considers himself a good employee.[74] He remains eligible to sign up for additional work, just as other Material Handlers are.[75] Lastly, Sanders' employee benefits have not been impacted by his modified schedule.[76]

## ARGUMENT AND AUTHORITIES

### I. The Summary Judgment Standard Requires Granting Summary Judgment to Bemis On All Claims.

Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to his case when that party bears the burden of proof of that element.[77] When there is a failure of proof concerning any essential element of the non-moving party's case, as here, there can be "no genuine issue of material fact" as such a failure "necessarily renders all other facts immaterial."[78] In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.[79] The moving party bears the initial burden of showing the absence of a genuine issue of material fact on the legal elements of the claim.[80] Once the moving party meets this burden, "the nonmoving party cannot rest on his pleadings but must

---

[71] Larry Sanders Deposition, p. 225, 390-392, collectively Exhibit 60.
[72] July 7, 2015 Letter from Kristina Mellen to Larry Sanders, attached as Exhibit 61.
[73] Larry Sanders Deposition, p. 393, Exhibit 62.
[74] Larry Sanders Deposition, p. 179, Exhibit 63.
[75] Larry Sanders Deposition, pp. 374-375, Exhibit 64.
[76] Larry Sanders Deposition, pp. 435-436, Exhibit 65.
[77] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).
[78] *Id.* at 323.
[79] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).
[80] *Id.*

identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial."[81]

Here, Sanders bears the burden of proving his claims and he "may not rest on [his] pleadings; rather, he must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."[82] The Court is not required to search the record for evidence to defeat the motion for summary judgment.[83] While the Court must view the evidence in the light most favorable to Sanders, "[n]either the mere existence of some alleged factual dispute between the parties . . . nor the existence of some metaphysical doubt as to the material facts . . . is sufficient to defeat a motion for summary judgment."[84]

Bemis is entitled to summary judgment on each of Sanders' five claims because he is unable to establish one or more essential elements or to create any genuine issue of material fact as to his claims. Sanders is not "disabled" as defined by the Kentucky Civil Rights Act and did not request any medically necessary accommodation to conform with physical limitations and indeed he has none. Further, Sanders cannot establish that he was discriminated against because of his gender as he has no proof that any similarly situated female worker was treated more favorably. And, his retaliation claim also fails because leaving work early without authorization is not a protected activity and, even if it were, Sanders admits that he never received any discipline, change in benefits or other adverse action. By the same token, Sanders' common law claims of intentional infliction of emotional distress and promissory estoppel fail as a matter of law. There are no genuine issues of material fact and Bemis is entitled to summary judgment on each of Sanders' claims.

---

[81] *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006).
[82] *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (citation omitted).
[83] *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted).
[84] *Id.* (citation and internal quotations omitted).

## II. Bemis Is Entitled to Summary Judgment on Sanders' Claim for Disability Discrimination.

Sanders' disability discrimination claim is based solely on the fact that he was required to work the Material Handler 12-hour shift schedule for a six-month period from June 2014 to December 2014 – which he did without any problem or job modification.[85] He claims that Bemis failed to "accommodate" his asserted disability by requiring him to work this shift. But, Sanders is unable to establish his claim of disability discrimination because he is not "disabled" under the KCRA and because he never requested any reasonable accommodation under the law. Since December 2014 he has worked eight-hours per workday and continues to do so. Therefore, the Court should grant summary judgment in favor of Bemis.

### A. Sanders is not disabled.

First and foremost, Sanders is not disabled under the Kentucky Civil Rights Act. The KCRA defines disability as "[a] physical or mental impairment that substantially limits one or more of the major life activities of the individual."[86] Sanders and his doctor both admit he is not substantially limited in *any* major life activity.[87]

Under Kentucky law, a physical impairment alone is not enough to constitute a disability.[88] Rather, Sanders must prove that **the impairment "limits a major life activity," and this limitation must be "substantial."**[89] In order to be substantially limited in performing a major life activity, "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives," such as walking,

[85] Larry Sanders Deposition, pp. 228-230, Exhibit 66.
[86] KRS § 344.010(4).
[87] While Sanders may argue that the federal Americans With Disabilities Act's broader definition of "disability" applies, courts have rejected this notion. "[T]he KCRA retains the ADA's *former* definition of disability," which is based not on the amended ADA's broader definition of "disability," but rather is based on the pre-amendment ADA and interpreting case law. *Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp. 2d 653, 658 n.2 (W.D. Ky. 2012) (emphasis in original). *See also, Laferty v. U.P.S., Inc.*, 2016 U.S. Dist. LEX 59031, *9, n. 3 (W.D. Ky. May 4, 2016); *Suchanek v. Univ. of Ky.*, 2011 U.S. Dist. LEXIS 80958, *17-18, n. 1 (E.D. Ky. July 25, 2011)
[88] *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003).
[89] *Id.*

seeing, hearing, performing manual tasks, caring for oneself, speaking, breathing, learning, and working."[90] The Supreme Court of Kentucky has recognized that "the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with a particular job."[91] Whether a plaintiff has an impairment and whether the impairment affects a major life activity are questions of law that the Court may address at the summary judgment stage.[92]

Sanders freely admits that he is <u>not</u> substantially limited in any major life activity. Instead, Sanders admits that he is capable of performing his job duties in their entirety and without exception, both working eight-hour and 12-hour shifts.[93] Sanders also testified that he is capable of driving, taking care of his home, and spending time with his spouse and adult children.[94] Sanders is able to work on home remodeling, including re-treading his stairs[95] and rebuilding his deck.[96] Sanders also routinely mows his yard of approximately one-and-a-half acres,[97] cooks, grocery shops, does household chores,[98] hunts,[99] and camps out.[100] In his post-employment questionnaire for Bemis in 2009, Sanders did not indicate that he was an individual with a disability or request any accommodation or job modification.[101] In June 2014 his physician expressly stated that Sanders is not substantially limited in any major life activities as a result of his diabetes, that Sanders is able to perform all of the essential functions of his position, and, that Sanders does not have any functional

---

90 *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 198 (2002).
91 *Howard Baer, Inc.*, 127 S.W.3d at 593 (citing *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002) (internal quotation marks omitted)).
92 *Hallahan v. Courier-Journal*, 138 S.W.3d at 707.
93 Larry Sanders Deposition, p. 179-180, 227-229, 232-233, collectively Exhibit 67.
94 Larry Sanders Deposition, pp. 179-180, previously attached as Exhibit 67.
95 Larry Sanders Deposition, pp. 34-35, Exhibit 68.
96 Larry Sanders Deposition, pp. 39-40, Exhibit 69.
97 Larry Sanders Deposition, pp. 40-42, Exhibit 70.
98 Larry Sanders Deposition, pp. 56-57, Exhibit 71.
99 Larry Sanders Deposition, pp. 48-49, Exhibit 72.
100 Larry Sanders Deposition, p. 54, Exhibit 73.
101 Larry Sanders Post-Employment Questionnaire, previously attached as Exhibit 10. *See also* Larry Sanders Deposition, pp. 194-95, attached as Exhibit 74.

limitations.[102] Sanders agrees with his doctor's opinions on these issues.[103] Another physician similarly stated in 2015 that Sanders is able to work 12-hour shifts when he is rested and "felt up to it."[104] Again, Sanders agrees with this doctor's opinion that he can work 12-hour shifts if he "felt up" to it.[105]

In addition to Sanders' admissions that he is not substantially limited in any major life activity as defined by the KCRA, he also concedes that he is not substantially impaired by his diabetes. He testified that he has "tingling" in his feet as the result of diabetic neuropathy, which occasionally wakes him up at night; but the "tingling" is not severe enough for him to take medication on a daily basis.[106] In fact, he had only refilled his neuropathy medication one time in over a year.[107] Sanders acknowledged that he is fatigued, but testified that his fatigue is because of his untreated low testosterone, not his diabetes,[108] and that his disability claim is not based on low testosterone.[109]

While Sanders has a diagnosed medical condition, his own testimony, as well as his doctors' opinions, demonstrate that he is not substantially limited in any major life activity whatsoever – an essential element of his claim of disability discrimination. Because Sanders is not disabled, he cannot establish his claim for disability discrimination and the Court should grant summary judgment in favor of Bemis on this claim.

---

[102] June 20, 2014 Letter from Dr. Donald Wood, previously attached as Exhibit 24.
[103] Larry Sanders Deposition, pp. 220-221, Exhibit 75.
[104] March 11, 2015 Letter from Dr. Arar, previously attached as Exhibit 55.
[105] Larry Sanders Deposition, p. 257-258, Exhibit 76.
[106] Larry Sanders Deposition, pp. 78-79, Exhibit 77.
[107] Larry Sanders Deposition, p. 78, previously attached as Exhibit 77.
[108] Larry Sanders Deposition, p. 86, Exhibit 78.
[109] Larry Sanders Deposition, p. 91, Exhibit 79.

**B. Sanders did not request a reasonable accommodation.**

Even if Sanders were disabled under the KCRA and thus protected under the law, he cannot establish that he was discriminated against by not receiving his preferred work days and hours because, simply put, he never requested any "accommodation" under the law.

"The employee bears the burden of requesting a reasonable accommodation."[110] While there is no bright-line rule for when an employee's request is "sufficiently clear to constitute a request for an accommodation,"[111] **the employee must "make it clear from the context that [the request] is being made in order to conform with existing medical restrictions."**[112] "[I]n requesting an accommodation, we require plaintiffs not only to request to be accommodated, but **to also provide their employers with a sufficient basis to understand that the request is being made because of their disability."**[113] Sanders never requested any accommodation in June 2014 before he began working the regular 12-hour shift. Sanders has no evidence that his requested eight-hour shift was – or is – necessary to conform with or because of existing medical restrictions. His own testimony and his doctor's opinions in fact state the opposite. Thus, Sanders' claim of disability discrimination fails and should be dismissed.

Sanders' June 20, 2014 physician's note states only that he "recommend[s] that [Sanders] work an eight-hour shift rather than a 12-hour shift…"[114] That same letter from Dr. Wood also states that Sanders is <u>not</u> substantially limited in any major life activities as a result of his diabetes, that Sanders <u>is</u> able to perform all of the essential functions of his position, and, that Sanders' diabetes does <u>not</u> restrict him with any functional limitations. Sanders did not ask Dr. Wood if he was medically able to work a 12-hour shift or if an eight-hour schedule was required "to conform

---

[110] *Aldini v. Kroger Company of Michigan*, 628 Fed. Appx. at 350. For issues of reasonable accommodation, Kentucky Courts look to federal jurisprudence for guidance. *See generally Wymer v. JH Properties, Inc.*, 50 S.W.3d 195, 199-200 (Ky. 2001).

[111] *Judge v. Landscape Forms, Inc.*, 592 Fed. Appx. 403, 407 (6th Cir. 2014).

[112] *Leeds v. Potter*, 249 Fed. Appx. 442, 449 (6th Cir. 2007).

[113] *Deister v. Auto Club Insurance Association*, 2016 U.S. App. LEXIS 8792, *15 (6th Cir. May 11, 2016) (emphasis added).

[114] June 20, 2014 Letter from Dr. Donald Wood, previously attached as Exhibit 24.

with existing medical restrictions." Instead, he told Dr. Wood that he did not "want" to work 12-hour shifts.

There is no medical documentation to suggest that Sanders' request for eight-hour/Monday through Friday work was **because of** his diabetes or necessary to conform to any existing medical restrictions. Indeed, Sanders had no medical restrictions as expressly stated by his doctor. And, for the six-month period that Sanders worked the regular Material Handler 12-hour shift, Sanders never asked for any job modification and "didn't need" any.[115]

**C. Bemis ultimately provided Sanders with his request for eight-hour work days.**

Sanders is not disabled under the law and thus not entitled to any reasonable job accommodation. Bemis nevertheless did not sanction him in any way when he began leaving work after eight hours without authorization. Instead, Bemis worked with Sanders to establish a schedule that allowed Sanders to work eight-hour shifts. While Sanders would prefer to work Monday to Friday 7AM to 3PM than his current schedule, he admits that no doctor has ever suggested to him that he is medically restricted from working weekends or only during certain hours.[116] And, even though Sanders' one-time consultation with Dr. Arar resulted in documentation stating that Sanders could work a 12-hour shift "based on how he feels" because of his neuropathy, since December 2014, Sanders has not worked any work day over eight hours.[117]

An employer is not required to provide a disabled employee his preferred accommodation. In *Johnson v. Cleveland City School District*,[118] the employer provided the plaintiff with an accommodation in conformity with her restrictions by providing her with a new position. The plaintiff filed suit and claimed that her employer failed to accommodate her by not providing her with the specific position that she wanted. Nevertheless, the Sixth Circuit Court of Appeals held

[115] Larry Sanders Deposition, pp. 228-230, Exhibit 80.
[116] Larry Sanders Deposition, pp. 258, 311, 391-394, collectively Exhibit 81.
[117] Larry Sanders Deposition, pp. 428-429, Exhibit 82.
[118] *Johnson v. Cleveland City School District*, 344 Fed. Appx. 104 (6th Cir. 2009).

that "while [the plaintiff] may have preferred another position to accommodate her disability, the [employer] satisfied its obligations under the ADA by providing a position that complied with [the plaintiff's] requested accommodations."[119] Because the employer had provided the plaintiff with a position that complied with the requested accommodations, there was no violation of the ADA even though the plaintiff may have preferred a different accommodation.[120]

The same result should apply here. Sanders requested to work only eight-hour shifts; while not disabled under the law, Sanders has been working an eight-hour shift for nearly two years. There is no evidence of any failure to accommodate Sanders' alleged disability and no evidence of disability discrimination. The Court should grant summary judgment in favor of Bemis.

## III. Bemis Is Entitled to Summary Judgment on Sanders' Gender Discrimination Claim.

Although not identified in his Complaint as such, Sanders' claim for gender discrimination under the KCRA is actually a claim of reverse gender discrimination – that is, that Bemis discriminated against Sanders because he is a male by allowing Shipping and Receiving Clerk Christy LeCompte, a female, to work an eight-hour shift while he worked the Material Handler 12-hour shift for six months.[121] To prevail on such a claim, Sanders must establish a *prima facie* case showing "(1) that the Defendant is that unusual employer who discriminates against the majority; (2) that [he was] qualified for the position in question; (3) that [he] suffered an adverse employment action . . . ; and (4) that [he was] treated differently than other similarly situated employees."[122] Sanders cannot make any element of this showing and the Court should grant summary judgment in favor of Bemis.

---

[119] *Id.* at 112-13.
[120] *Id.* at 113.
[121] Complaint, paragraph 63.
[122] *Brown v. Accenture Federal Services*, 2016 U.S. Dist. LEXIS 76632, *31 (E.D. Ky. June 13, 2016).

**A. Sanders cannot establish that Bemis is the "unusual employer" who discriminates against men.**

At the outset, it is important to note that Sanders has claimed that the individual who discriminated against him on the basis of his gender is Mike Purvis,[123] who is also male. The Court of Appeals of Kentucky has recognized that, in a reverse gender discrimination claim, evidence that "the majority of the senior management and those who made the decision to demote [the plaintiff] were men" demonstrates that the employer is not the "unusual employer" that discriminates against men.[124] As the Eastern District of Kentucky has recognized, where the decisionmaker is also male, "it does not follow that reverse gender discrimination led to [the adverse employment action]."[125] Other courts within the Sixth Circuit considering this issue have reached the same logical conclusion: where the male plaintiff challenges an action by a male decision-maker, there are not the required background circumstances to show that the employer is the "unusual employer" who discriminates against men.[126] Because Sanders has failed to provide any evidence to satisfy even the first element of his *prima facie* case of reverse gender discrimination, the Court should grant summary judgment to Bemis on this claim.

**B. Sanders cannot point to any similarly situated female who was treated more favorably.**

In support of his reverse gender discrimination claim, Sanders identifies Shipping and Receiving Clerk Christy LeCompte as having been treated more favorably. But because LeCompte is not in any way similarly situated to Sanders, he fails to establish this element of his *prima facie* case as well.

---

[123] Complaint, paragraph 66.
[124] *Flock v. Brown-Forman Corp.*, 344 S.W.3d at 117-118.
[125] *Beckman v. Aramark, LLC*, 2014 U.S. Dist. LEXIS 86806, *8 (E.D. Ky. June 26, 2014).
[126] *See Hout v. City of Mansfield*, 550 F. Supp. 2d 701, 723 (N.D. Ohio 2008) (male decisionmakers meant that there were insufficient background circumstances to establish a prima facie case of reverse gender discrimination); *Owczarzak v. St. Mary's Michigan*, 2011 U.S. Dist. LEXIS 126180, *4 (E.D. Mich. Nov. 1, 2011) (male decisionmakers negated the first element of the plaintiff's prima facie case in a reverse gender discrimination claim).

The Supreme Court of Kentucky has recently recognized that "[i]n identifying suitable comparators, [courts] must select individuals who are similarly situated in all relevant aspects."[127] To satisfy this standard, the plaintiff "must present evidence that all relevant aspects of [his] employment situation are nearly identical to those of the employees who [ ]he alleges were treated more favorably."[128] In *Board of Regents of Northern Kentucky University v. Weickgenannt*, the Supreme Court of Kentucky held that the plaintiff failed to establish her *prima facie* case because she could not identify any employees who were similarly situated to her in all relevant respects. There, the plaintiff failed to identify any employees outside of her protected class with the same performance deficiencies that she had who were subject to decisions by the same decisionmaker she was.[129] As such, she could not establish her *prima facie* case of discrimination and summary judgment was properly entered in favor of her employer. Numerous Kentucky cases apply the same standard for a plaintiff to demonstrate that a non-protected employee is similarly situated yet treated more favorably.[130]

Instructively, the federal courts apply the same standard and have reached identical results. In *Russell v. University of Toledo*,[131] the Sixth Circuit Court of Appeals held that where there was a history of complaints about the plaintiff's work performance and attitude, as well as multiple disciplinary actions, the plaintiff was not similarly situated to other employees because those employees did not have similar histories of discipline. "[T]he individuals with whom the plaintiff seeks to compare his/her treatment must … have been subject to the same standards and have

---

[127] *Board of Regents of Northern Kentucky University v. Weickgenannt*, 485 S.W.3d 299, *19 (Ky. 2016) (internal quotation marks omitted).
[128] *Id.* (internal quotation marks omitted).
[129] *Id.* at *19 – *20.
[130] *See also Commonwealth v. Solly*, 253 S.W.3d 537 (Ky. 2008) (holding that an employee could not establish a *prima facie* sex discrimination claim because she could not identify a male employee who was similarly situated); *Murray v. Eastern Kentucky University*, 328 S.W.3d 679 (Ky. App. 2009) (same); *McBrearty v. Kentucky Community & Technical College System*, 262 S.W.3d 205 (Ky. App. 2008) (same); *Irvin v. Aubrey*, 92 S.W.3d 87 (Ky. App. 2001) (holding that an employee could not establish a *prima facie* racial discrimination claim because he could not identify a Caucasian employee who was similarly situated).
[131] *Russell v. University of Toledo*, 537 F.3d 596, 607 (6th Cir. 2008).

*engaged in the same conduct* without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."[132]

There is absolutely no proof that LeCompte was similarly situated to Sanders because, as Sanders admits, they held completely different jobs with different job titles: Sanders is a Material Handler and LeCompte is a Shipping and Receiving Clerk.[133] Sanders admits that he does not even know LeCompte's job title.[134] Sanders admits that he and LeCompte have very different job descriptions, position requirements, and job duties.[135] In fact, Sanders admits that he and LeCompte are in the same work areas at times, but perform entirely different jobs:

> Q. Ms. LeCompte is – in her position [as] Shipping and Receiving Clerk, she's in the office with Mr. Purvis; is that right?
>
> A. Yes.
>
> Q. OK. And when Mr. Purvis has to go to another part of the plant or leave the warehouse or if he's not around, and she sort of keeps an eye on things, correct?
>
> A. Yes.
>
> Q. OK. And she acts as his backup as Supervisor; is that right?
>
> A. Yes.
>
> Q. And she also answers phones in the office, correct?
>
> A. Yes.
>
> Q. And communicates with the trucking companies that are doing the various deliveries?
>
> A. Yes.
>
> Q. And she's responsible, as I understand it, for the bills of lading and making sure they're completed?

---

132 *Id.* (emphasis added) *See also, Hester v. Indiana State Dep't of Health*, 726 F.3d 942, 945-946 (7th Cir. 2013); *Grayson v. O'Neil*, 308 F.3d 808 (7th Cir. 2002).
133 Larry Sanders Deposition, p. 131; Christy LeCompte 2010 Performance Evaluation, attached collectively as Exhibit 83.
134 Larry Sanders Deposition, pp. 289, 373-374, collectively attached as Exhibit 84.
135 Larry Sanders Deposition, pp. 312-318, Exhibit 85.

A. Yes.

Q. OK. Managing the receipts that come in to confirm that – that you all have, in fact, received the goods that are being billed to you?

A. Yes.

Q. Do you understand that that's part of her job?

A. Yes.

Q. OK. Are any of those things part of your job in any way?

A. No.

Q. She also works on the SAP orders to confirm when goods come in, she helps track those; is that correct?

A. Yes.

Q. Is that part of your job at all?

A. No.

Q. And it's your understanding that Ms. LeCompte's regular work schedule is 7 AM to 3 PM; is that right?

A. Yes.

Q. And I guess she occasionally has to put in overtime?

A. Yes.

Q. But she does one job and you do another job, correct?

A. Yes.[136]

Sanders cannot establish the most basic element of his reverse gender discrimination claim: that he and LeCompte are similarly situated in any way. He admits that they have different job titles, different job requirements, different job duties, and perform entirely different jobs. Because Sanders and LeCompte are not similarly situated, and Sanders has not presented evidence of anyone else similarly situated to him, much less someone treated more favorably, he has no

[136] Larry Sanders Deposition, pp. 316-318, previously attached as Exhibit 85.

evidence to support his claim of reverse gender discrimination. This Court should enter summary judgment in favor of Bemis on this claim.

## IV. Bemis Is Entitled to Summary Judgment on Sanders' Retaliation Claim.

Sanders' retaliation claim likewise fails. The Supreme Court of Kentucky has made clear that a plaintiff claiming retaliation under the KCRA must show that "(1) [he] engaged in a protected activity, (2) [he] was disadvantaged by an act of [his] employer, and (3) there was a causal connection between the activity engaged in and the [defendant] employer's act."[137] Without proof of both a protected activity and an adverse employment action, there is no viable claim for retaliation. Here, Sanders cannot establish either element and the Court should grant summary judgment in favor of Bemis on this claim too.

### A. Sanders did not engage in protected activity.

The anti-retaliation provision of the KCRA prohibits retaliation or discrimination "in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter . . . ."[138] Sanders does not base his retaliation claim on either participating in a proceeding under the KCRA or on opposing an unlawful practice under the KCRA. Indeed, he admits that he did not make any complaints of discrimination at all to anyone at Bemis.[139] Rather, Sanders bases his claim solely on his belief that he was "retaliated" against for unilaterally deciding to leave work at 3:00 PM each day without authorization to do so:

> Q. And what do you think Bemis was retaliating against you for? What do you believe you did that led Bemis to retaliate?

---

[137] *Banker v. University of Louisville Athletic Association, Inc.*, 466 S.W.3d 456, 460 (Ky. 2015) (internal quotation marks omitted).
[138] KRS § 344.280(1) (emphasis added).
[139] Larry Sanders Deposition, pp. 404-405, Exhibit 86.

A. About leaving at 3:00.[140]

Clearly leaving work early when not authorized to do so does not constitute the required protected activity under the law. For this reason alone, Sanders' retaliation claim fails as a matter of law.

**B. Sanders did not suffer an adverse employment action.**

Even if Sanders could establish that he had engaged in "protected activity" sufficient to state a claim for retaliation, he cannot establish that he was subjected to any adverse employment action as a result because he has not been disciplined, demoted, or terminated. His benefits have not been altered. He remains employed with Bemis as a Material Handler. He is paid according to his hours worked and is able to sign up for additional/overtime (although he has done so just once).[141] He has not been denied the opportunity to work extra shifts when needed by the Company.[142]

In the retaliation context, a plaintiff must establish that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[143] Sanders testified that Bemis had retaliated against him in two ways. First, he claims that Bemis "[took] away my receiving [responsibilities] and gave them to Christy [LeCompte]."[144] But, Sanders admits that LeCompte began doing this data entry in 2013 when he moved from the plant to the warehouse – long before he was asked to and began working the standard 12-hour shift schedule in June 2014 and even longer before he began leaving work early in December 2014.[145] Clearly there can be no retaliation for conduct that Sanders had not even engaged in yet. Further, Sanders described the "receiving responsibilities" that were given to LeCompte as "enter[ing] information into the

[140] Larry Sanders Deposition, p. 415, Exhibit 87.
[141] Larry Sanders Deposition, pp. 122, 375, collectively Exhibit 88.
[142] Larry Sanders Deposition, p. 375, previously attached as Exhibit 88.
[143] *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).
[144] Larry Sanders Deposition, p. 406, Exhibit 89.
[145] Larry Sanders Deposition, p. 408, Exhibit 90.

computer about what's gotten received and what hasn't."[146] But, Sanders admits that the only "receiving responsibility" LeCompte performs is entering warehouse receiving information into the computer.[147] He further admits that he continues to perform all other receiving duties in the warehouse and that his pay was not decreased when LeCompte began doing the data entry.[148] And, he further admits that he has no evidence that LeCompte received a pay increase as a result of taking on that duty and that no one ever told him that LeCompte was now entering information into the computer because she is a female or not a diabetic.[149] Moreover, Sanders admits that he does not have the background or experience to perform LeCompte's shipping duties in the warehouse or to fill in for the manager in his absence.[150]

As the Supreme Court of Kentucky recognized in *Brooks v. Lexington-Fayette Urban County Housing Authority*, "[a] materially adverse change in the terms and conditions of employment, must be more disruptive than a mere inconvenience or an alteration of job responsibilities."[151] Here, Sanders has not claimed that the alleged alteration of his job responsibilities was anything more than an alteration of one job task. Thus, even accepting Sanders' statements about LeCompte's job responsibilities as true, this minor modification of his job responsibilities – that predates his conduct that allegedly led to retaliation – does not rise to the level of an adverse employment action.

Second, Sanders has offered the novel idea that LeCompte's work schedule as Shipping Clerk is somehow a retaliatory action against him.[152] But Sanders cannot offer any authority to support his argument that LeCompte's established schedule is an action by Bemis that might have dissuaded a reasonable worker from engaging in protected activity. And, moreover, Sanders freely

---

[146] Larry Sanders Deposition, p. 411, Exhibit 91.
[147] Larry Sanders Deposition, pp. 411, previously attached as Exhibit 91.
[148] Larry Sanders Deposition, pp. 411-412, Exhibit 92
[149] Larry Sanders Deposition, p. 412, previously attached as Exhibit 92
[150] Larry Sanders Deposition, pp. 413-414, Exhibit 93.
[151] *Brooks v. Lexington-Fayette Urban County Housing Authority*, 132 S.W.3d 790, 802 (Ky. 2004) (quoting *Hollins v. Atlantic Co., Inc*, 188 F.3d 652, 662 (6th Cir. 1999)).
[152] Larry Sanders Deposition, p. 408, Exhibit 94.

admits that he does not know LeCompte's job title and concedes that he and LeCompte have very different job duties, job descriptions, and position requirements.[153] Further, Sanders cannot name any other worker in his job position of Material Handler who has worked or is working an eight-hour shift, other than himself.[154] LeCompte, as Sanders acknowledges, is not a Material Handler.[155] Lastly, Sanders admits that nothing about LeCompte's work schedule impacts his own.[156]

Because Sanders neither engaged in protected activity nor suffered an adverse employment action, he has failed to show that a genuine dispute of material fact exists and, as such, the Court should grant Bemis' Motion for Summary Judgment.

## V. Bemis Is Entitled to Summary Judgment on Sanders' Claim for Intentional Infliction of Emotional Distress.

Like his statutory claims, Sanders cannot maintain his claim for intentional infliction of emotional distress (IIED) as a matter of law because, under well-established Kentucky law, it is subsumed and preempted by his KCRA claims. And, even if it were legally viable as a separate claim, the claim still fails because Sanders cannot establish conduct that is sufficiently extreme and that exceeds all bounds of decency as required to survive summary judgment under Kentucky law.

### A. Sanders' claim for intentional infliction of emotional distress is subsumed by his KCRA claims.

Case after case recognizes that the tort of intentional infliction of emotional distress, or outrage, is a "gap-filler" tort that is only appropriate where no other tort actions could enable a plaintiff to recover emotional distress damages.[157] Where another claim provides for the recovery of emotional distress, "the tort of outrage will not lie."[158] Because intentional infliction of emotional distress is intended as a "gap-filler," a plaintiff cannot maintain such a claim in connection with

---

[153] Larry Sanders Deposition, pp. 289, 312, 316-318, 373-374, collectively Exhibit 95.
[154] Larry Sanders Deposition, p. 383, Exhibit 96.
[155] Larry Sanders Deposition, p. 401, Exhibit 97.
[156] Larry Sanders Deposition, pp. 400-401, 414-415, collectively Exhibit 98.
[157] *Litsey v. Allen*, 371 S.W.3d 786, 789 (Ky. App. 2012).
[158] *Banks v. Fritsch*, 39 S.W.3d 474, 481 (Ky. App. 2001).

another claim that allows for the recovery of emotional distress damages. Thus, as here, "when a plaintiff prosecutes a KRS Chapter 344 claim and an outrageous conduct claim concurrently, the former preempts the latter."[159] A plaintiff's "IIED claim against [the employer] was subsumed by its KRS Chapter 344 claims."[160] This result is required by the legal axiom that "[w]here the statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute."[161]

Here, Sanders' claim for intentional infliction of emotional distress is based on the same alleged actions that support his KCRA claims – specifically, that he was required to work a 12-hour shift for a six-month period. The KCRA is Sanders' exclusive remedy for his claims of emotional distress arising from this asserted conduct and the Court should grant summary judgment to Bemis on this claim.

**B. Sanders has not alleged conduct that rises to the level of outrageousness required to establish intentional infliction of emotional distress.**

Even if Sanders' IIED claim were distinct and separate from his claims under the KCRA, which it is not, he cannot establish a *prima facie* case of intentional infliction of emotional distress as a matter of law. To establish such a *prima facie* case, a plaintiff must show that "1) the wrongdoer's conduct must be intentional or reckless; 2) the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; 3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and 4) the emotional distress must be severe."[162] Here, there is no evidence that Bemis' conduct was sufficiently "outrageous" and "offensive to general standards of morality" as a matter of law. The mere fact that

---

159 *Kroger Co. v. Buckley*, 113 S.W.3d 644, 646 (Ky. App. 2003).
160 *Wilson v. Lowe's Home Center*, 75 S.W.3d 229, 239 (Ky. App. 2001).
161 *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985).
162 *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788 (Ky. 2004).

Sanders was required to work the standard 12-hour shift for six months in no way rises to the level of outrageousness required and Sanders' claim should be dismissed.

Kentucky's courts have recognized liability for intentional infliction of emotional distress "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[163] "[M]ajor outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough."[164]

Even cases of extreme "bad conduct" have not been enough to satisfy this demanding standard. Intentional infliction of emotional distress "is not available for petty insults, unkind words and minor indignities. Nor is it to compensate for behavior that is cold, callous and lacking sensitivity. Rather, it is intended to redress behavior that is truly outrageous, intolerable and which results in bringing one to his knees."[165] Kentucky's courts have rejected claims for intentional infliction of emotional distress in cases with much more egregious conduct than the conduct here: an individual committed fraud during divorce proceedings by converting funds belonging to his spouse to his own use;[166] a woman who had given birth to a stillborn fetus was told by the hospital staff to "shut up" because she was disturbing other patients and was then told by the hospital staff that "we dispose of [the remains] right here at the hospital";[167] an individual placed a billboard in his yard that read "danger – child molester in the community" about his neighbor;[168] a company wrongfully garnished an individual's wages based upon a forged judgment;[169] a high school teacher

---

[163] *Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990).
[164] *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 791 (Ky. 2004).
[165] *Goodman v. Goldberg & Simpson, PSC*, 323 S.W.3d 740, 746 (Ky. App. 2009) (internal citations and quotation marks omitted).
[166] *Whittington v. Whittington*, 766 S.W.2d 73 (Ky. App. 1989).
[167] *Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1 (Ky. 1990).
[168] *Allen v. Clemons*, 920 S.W.2d 884 (Ky. App. 1996).
[169] *Kentucky Farm Bureau Mutual Insurance Co. v. Burton*, 922 S.W.2d 385 (Ky. App. 1996).

chained one of his students to a tree by his ankle and neck;[170] and, a priest sexually molested a child.[171] Courts have determined that none of the conduct at issue in those cases rose to the level of being so intolerable in a civilized community as a matter of law. There is no evidence of any conduct here that is sufficiently outrageous and intolerably offensive to generally accepted standards of decency and morality.

Thus, even if Sanders' intentional infliction of emotional distress claim were not subsumed by the KCRA, the asserted conduct falls far short of the demanding standard to create an issue of fact to present an IIED claim to a jury. Accordingly, as with Sanders' other claims, Bemis is entitled to summary judgment on this claim.

## VI. Bemis Is Entitled to Summary Judgment on Sanders' Promissory Estoppel Claim.

Like his other claims, Sanders' promissory estoppel claim fails as a matter of law. Sanders' claim is based solely on his unsupported assertion that Bemis had posted a memo to all employees that espoused a general statement of policy about working conditions. According to Sanders' Complaint, this August 15, 2014 memo – which Sanders cannot produce – stated that Bemis is "committed to providing our employees with working conditions that allow each of you the opportunity to excel and advance your careers while providing a good quality of life for you and your families."[172] Sanders admits that he has no idea where the alleged "promise" recited in his Complaint came from:

> Q. [Referring to paragraph 53 of Plaintiff's Complaint] Do you have a copy of this memo?
>
> A. I don't know.
>
> Q. Do you know whether your wife has a copy of this memo?
>
> A. No, I don't. …

---

[170] *Banks v. Fritsch*, 39 S.W.3d 474 (Ky. App. 2001).

[171] *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295 (Ky. App. 1993); *see, also, Main v. Rio Tinto Alcan, Inc.*, 2016 U.S. Dist. LEXIS 20280, *30 (W.D. Ky. Feb. 19, 2016); *Thompson v. AK Steel Corp.*, 2015 U.S. Dist. LEXIS 160042, *6 (E.D. Ky. Nov. 30, 2015).

[172] Complaint, paragraph 33.

Q. Do you know where this language that is in quotation marks in Paragraph 53 [of your Complaint] came from?

A. Not off the top of my head, no.

Q. Do you recall this memo that's referred to here dated August 15, 2014?

A. Not right off the top of my head, no. … I don't know. I don't -- I don't know. I don't know where it – how it – how I got it or where it came from. I just don't right off the top of my head, I don't know. . . .

Q. Okay. And you don't recall when you got it, do you?

A. No.

Q. You don't recall who gave it to you, do you?

A. No.

Q. You don't recall who it was addressed to, do you?

A. No.

Q. You don't recall specifically what it said, other than what's in this Complaint, do you?

A. No.[173]

Not only does he not have a copy of this memo, Sanders does not know whether, when, or how it was allegedly disseminated to employees.[174] Asked exactly when Bemis "promised him a quality of life," Sanders said only, "[e]vidently they did. Like I'm saying, I don't know."[175]

While Sanders cannot even establish that Bemis made such a "promise" to him, for the limited purposes of summary judgment only, Bemis will assume that this alleged memo contained the purported language referenced in Sanders' Complaint. Even with this tenuous assumption, Sanders cannot establish a viable claim for promissory estoppel because, first, he admits he did not rely on the purported promise, to his detriment or otherwise, and, second, such a general policy statement cannot support a claim of promissory estoppel as a matter of law.

[173] Larry Sanders Deposition, pp. 385-389, Exhibit 99.
[174] Larry Sanders Deposition, pp. 387-388, previously attached as Exhibit 99.
[175] Larry Sanders Deposition, p. 388, previously attached as Exhibit 99.

**A. Sanders did not rely to his detriment on any alleged promise by Bemis.**

Under Kentucky law, promissory estoppel requires proof of a promise that prompts detrimental reliance by the plaintiff:

> [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.[176]

At the outset, according to Sanders' Complaint, Bemis allegedly posted this memorandum on August 15, 2014, over a month *after* Sanders began working a 12-hour shift. Thus, Sanders could not have relied upon this alleged memorandum in making any decision about whether to request an eight-hour shift.[177] Moreover, Sanders admits that he did not rely on this alleged memo and that he never took any action in reliance upon that purported "promise":

> Q. We looked at the complaint earlier with respect to this August 15, 2014, memo that we haven't seen and we can't look at, and you told me that you really didn't do anything differently in terms of doing your job or showing up for work as a result of that memo, right?
>
> A. Yes.
>
> Q. Okay. Did you rely on that promise from Bemis in any way?
>
> A. Well, I would hope they would keep their word.
>
> Q. Okay. Did you do anything differently based on your belief that they would keep that promise or keep their word?
>
> A. I'm sorry. One more time.
>
> Q. Did you do anything differently because they had made that promise to you?
>
> A. No.[178]

[176] *Lichtefeld-Massaro, Inc. v. R.J. Manteuffel Co.*, 806 S.W.2d 42 (Ky. App. 1991).
[177] Larry Sanders Deposition, pp. 397-398, Exhibit 100.
[178] Larry Sanders Deposition, pp. 418-419, Exhibit 101.

Sanders admits that he did not take any action or forbear from any conduct because of this alleged promise and, therefore, cannot demonstrate that he relied upon this alleged promise, much less to his detriment, as required to establish a claim for promissory estoppel.

The Western District of Kentucky considered a similar situation in *Harris v. Burger King Corp.*[179] The plaintiff in that case claimed that her manager had promised her that she would be returned to her job following a medical leave.[180] Nevertheless, the Court found that the plaintiff had not shown detrimental reliance on this promise as "[p]laintiff does not allege that, absent this promise, she would not have undergone surgery or would have postponed it."[181] Because the plaintiff in that case did not allege any action she had taken or had refrained from taking to her detriment as a result of her employer's promise, the court dismissed her claim of promissory estoppel.[182] The same result applies here.

**B. A general statement of policy does not constitute a promise sufficient to support a claim for promissory estoppel.**

Sanders' claim also fails because, as a matter of law, a general policy statement is insufficient to support this cause of action. "An at-will employee can claim promissory estoppel only if she can show a specific promise of job security."[183] Here, even if Sanders could prove that Bemis made this "promise," it contains no guarantee of job security. At most, Bemis made a statement that the company wants its employees to excel in their positions and will provide its employees career advancement and good working conditions. And, Sanders freely admits that he was an at-will employee who was not guaranteed any term or duration of employment; he further admits that he

---

[179] *Harris v. Burger King Corporation*, 993 F. Supp.2d 677 (W.D. Ky. 2014).
[180] *Id.* at 692.
[181] *Id.*
[182] *Id.*
[183] *Harris v. Burger King Corporation*, 993 F. Supp.2d 677, 691 (W.D. Ky. 2014).

never had any contract with Bemis that he would work only certain days of the week, only certain times of the day and only certain tasks.[184]

In *Downs v. Bel Brands USA, Inc.*,[185] the plaintiff claimed promissory estoppel in connection with an alleged promise that he could take old pallets from his employer, re-sell them, and keep the funds from the sales.[186] The plaintiff was ultimately terminated for engaging in this very practice. The Sixth Circuit Court of Appeals held that the plaintiff's promissory estoppel claim could not survive a motion to dismiss because "he does not claim that his supervisors made any promises regarding his job security."[187] Thus, "in light of the fact that at-will employees can be fired for any lawful reason," the Court held that "promissory estoppel [was] not a viable cause of action in Kentucky under the specific circumstances presented by this case."[188]

The Sixth Circuit Court of Appeals reached a similar result (applying Ohio law) in *Snyder v. AG Trucking*.[189] In that case, the plaintiff's promissory estoppel claim was based upon a statement similar to the one at issue here. The plaintiff in *Snyder* claimed that he was told by the president and vice-president of the company that "there would be a place there [at the new terminal] for me. That I would be given every opportunity to go and grow with the company. I was told about the retirement plan and could expect to be there until retirement."[190] The plaintiff also claimed that he was told that "AG Trucking was a fair company; all employees are treated fairly."[191] The Sixth Circuit Court of Appeals recognized, however, that the plaintiff's claim of promissory estoppel was deficient as a matter of law because "[t]hese statements are general comments about career growth and company policy; they are not

[184] Larry Sanders Deposition, pp. 196-197, 397, collectively Exhibit 102.
[185] *Downs v. Bel Brands USA, Inc.*, 2015 U.S. App. LEXIS 9344 (6th Cir. June 2, 2015).
[186] *Id.* at *2.
[187] *Id.* at *11.
[188] *Id.* at *11-*12.
[189] *Snyder v. AG Trucking*, 57 F.3d 484 (6th Cir. 1995).
[190] *Id.* at 489.
[191] *Id.*

sufficiently specific to change plaintiff's at will status."[192] Bemis' alleged memo is likewise a general comment about career growth and company policy. It is not a promise, much less one on which Sanders relied. As with his other claims, Sanders' claim of promissory estoppel fails.

## CONCLUSION

Bemis is entitled to summary judgment on Sanders' Complaint in its entirety. Each of Sanders' five claims fails as a matter of law. First, Sanders claims that he was discriminated against on the basis of an asserted disability, diabetes, in violation of the Kentucky Civil Rights Act because he was required to work the standard Material Handler 12-hour shift schedule for a six-month period from June 2014 to December 2014. However, based on Sanders' own testimony and his physician's opinion that Sanders can perform all essential functions of the job, is not substantially limited in any major life activity, and has no functional limitations, Sanders is not disabled under the Act.

Further, Sanders never requested a reasonable accommodation in accordance with the law inasmuch as there is not one piece of medical documentation to suggest that Sanders' request for an eight-hour shift was medically necessary to conform with existing medical restrictions; indeed, Sanders' physician expressly stated that he had no medical restrictions.

Sanders cannot establish the essential elements of a *prima facie* case of disability discrimination because he is not disabled under the law and did not request any job modification because of his diabetes. This claim should be dismissed.

Second, Sanders' reverse gender discrimination claim under the Kentucky Civil Rights Act should also be dismissed because he has no proof that Bemis is the "unusual employer" who discriminates against men. Nor can Sanders establish that any similarly situated female employee was treated more favorably than he was, given that the sole female employee he claims received

---

[192] *Id.*

better treatment (in the form of an eight-hour shift) admittedly works in a completely different job position, performing different job duties, and requiring different background, education, experience. This claim too should be dismissed.

Sanders' third statutory claim under the Kentucky Civil Rights Act – retaliation for leaving work four hours early without authorization to do so – also fails as a matter of law because Sanders did not engage in any protected activity and did not suffer any adverse employment action whatsoever as defined by law.

Finally, Sanders' "bootstrap" tort claims of intentional infliction of emotional distress and promissory estoppel likewise fail as a matter of law. His claim for intentional infliction of emotional distress is subsumed and preempted by his statutory claims inasmuch as they are based on the same alleged conduct. Moreover, the complained-of conduct in no way rises to the level of outrageousness and offensiveness required under Kentucky law. And, even if Sanders could establish that Bemis made some sort of representation to employees in a memo that Sanders does not remember and cannot produce, he admits that he did not rely on that memo in any form or fashion, much less rely on it to his detriment. Further, under Kentucky law a general statement of policy that does not make a specific promise of job security is wholly insufficient to support a claim for promissory estoppel.

Sanders' claims should be dismissed in their entirety with prejudice and Bemis' motion for summary judgment on all of Plaintiff's claims granted in its entirety.

Respectfully submitted,

/s/ Kathryn A. Quesenberry

Kathryn A. Quesenberry
Matthew Barszcz
Dinsmore & Shohl, LLP
101 S. Fifth Street, Suite 2500
Louisville, KY 40202
Telephone: (502) 540-2300
Facsimile: (502) 585-2207
Kathryn.Quesenberry@dinsmore.com
Matthew.Barszcz@dinsmore.com
*Counsel for Defendant, Bemis Company, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 1, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing on the following attorney(s) of record:

Samuel G. Hayward, Esq.
Adams, Hayward & Welsh
4036 Preston Highway
Louisville, Kentucky 40213
E-Mail: sam@samhaywardlaw.com
*Counsel for Plaintiff*

/s/ Kathryn A. Quesenberry
*Counsel for Defendant, Bemis Company, Inc.*